IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 26, 2018

## STATE OF TENNESSEE v. BILLY JOE HARRAH

**Appeal from the Criminal Court for Sullivan County**
**No. S65955   James F. Goodwin, Judge**

_____

### No. E2017-01869-CCA-R3-CD

_____

The Defendant-Appellant, Billy Joe Harrah, was convicted by a Sullivan County jury of rape of a child, aggravated sexual battery, and incest, for which he received an effective sentence of forty years' confinement.  On appeal, he argues (1) the evidence was insufficient to support each of his convictions; and (2) the trial court improperly instructed the jury regarding flight.  Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR., JJ., joined.

William A. Kennedy, Assistant Public Defender, for the Defendant-Appellant, Billy Joe Harrah.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Barry P. Staubus, District Attorney General; and William B. Harper, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

On November 2, 2015, after coming home from school, the eleven-year-old victim was forced to engage in oral sex upon her grandfather, the Defendant.  A few days later the victim reported the abuse to her mother, who in turn immediately reported it to the police.  On January 5, 2016, a Sullivan County Grand Jury returned a presentment against the Defendant charging rape of a child, aggravated sexual battery, and incest.  The following proof was adduced at the February 6, 2017 trial.

The victim, C.R.,[1] of Bristol, Tennessee, testified that her date of birth was in May 2004. On November 2, 2015, she came home from school and her "pap-paw," the Defendant, was the only person there. Although the Defendant did not live with her family, he watched her and her brother while her parents were at school and work. Once home, the victim changed for basketball practice and began watching television with the Defendant. At some point, the victim got up to use the bathroom, and when she came out, the Defendant was standing at the bathroom door. She said her "back was up against the wall and [the Defendant] was trying to kiss [her] . . . on [the] mouth." The victim did not kiss him back and tried to push him off of her. The Defendant then took her by the hand and led her down to the basement. They went into a "little room" downstairs, and the Defendant told her to "take down his pants."

The victim removed the Defendant's pants and underwear, and he told her to "put his penis in [her] mouth." The victim complied, so she would not get "in trouble." She said the Defendant started to move his hips back and forth and groaned for about ten minutes, all while holding the back of her head. He stopped when he ejaculated in her mouth and forced her to swallow the semen. The victim testified that when she pulled the Defendant's pants down, she noticed a brown, oval-shaped mole on his hip closer to his thigh. She did not tell anyone about the abuse until the next Monday when she sent her mom a text message. The victim acknowledged that after she told her mom, she provided an interview at the Children's Advocacy Center. She admitted that she did not tell them that the Defendant tried to kiss her. The victim also admitted that during the interview, she said the Defendant told her "you're going to suck my d**k until I come in your mouth and you're going to swallow it" instead of "put my penis in your mouth."

A.R., the victim's mother, testified that the Defendant was her father. On November 9, 2015, while riding the bus home from school, the victim sent her a text message stating, "your dad has been raping me." A.R. panicked and called the victim, who was crying. A.R. called her husband and told him to "go get [the victim] away from [the Defendant] until we can figure out what's going on." She said although the Defendant was at their house that day, no one confronted him about the abuse. A.R. testified that once her husband got home, he took the victim to her brother's wrestling practice, and the Defendant went with them. A.R. met them at the wrestling club and took the victim back home. The Defendant rode with A.R. and the victim back home. Once they arrived home, the Defendant said he had some errands to run and "disappeared." A.R. did not speak to him again and called the police that night. She testified that it was very strange that she did not speak to the Defendant since he was still receiving mail at her house. In the following weeks, the Defendant did not show up for his grandson's scheduled wrestling match or family Thanksgiving.

---

[1] It is the policy of this court to refer to minor victims and their family members by their initials.

James Sanders, an over-the-road truck driver, testified that during November 2015, the Defendant lived with him and his fiancé. Because of his job, Sanders and his fiancé were away from home several weeks at a time. Around October 2015, Sanders arranged for the Defendant to move into their home, rent free, in exchange for taking care of their house and dogs while they were traveling. Sanders recalled an incident in November 2015 when his truck was broken down in California. Sanders spoke with the Defendant on a Monday, and the Defendant advised him that everything was fine. Sanders said he had planned to talk to the Defendant the next day; however, he was unable to reach him for several days. Sanders explained that this was unusual because they would normally talk every other day. Sanders had other people to check on the Defendant and the house, but the Defendant was nowhere to be found. The Defendant never returned to the house for his medication, clothes, or any of his property.

Cody Waller, Sanders' cousin, testified and explained that Sanders was more akin to a father-figure to him. Waller confirmed that the Defendant lived with Sanders in November 2015. Although Waller had previously spent time with the Defendant, all contact ceased at some point in November 2015. During that same time, Waller received a phone call from Sanders asking him to check on their home "because the dogs [were] left out and it was just a mess." Waller said he went to the home, found it in disarray, and cleaned it and the dogs. While doing so, he noticed that the Defendant's medication and other belongings remained at the home. Waller said "everybody was trying to call [the Defendant] just to . . . make sure he was okay."

The Defendant's brother and the victim's uncle, Richard Harrah, testified that in November 2015, he lived in Pensacola, Florida. At that time, the Defendant lived in Bristol, Tennessee. Asked if the Defendant ever visited Florida, Richard Harrah could not recall and opined that the Defendant may have visited once during a five-year period. For the Thanksgiving holiday in 2015, the Harrah family met in Bristol, Tennessee, but the Defendant was not present. During this family gathering, Richard Harrah became aware of the sexual allegations against the Defendant. When he returned to Florida, he discovered the Defendant was in Mt. Richards, approximately 19 miles from Richard Harrah's home. The Defendant was staying at their father's home, which Richard Harrah believed was unusual. Richard Harrah went to his father's house and asked the Defendant, "So what I've heard is it true." In response, the Defendant nodded his head and said, "Yeah." Richard Harrah also testified that the Defendant told him that the victim was "his only and his first." On cross-examination, Richard Harrah confirmed that when he confronted the Defendant, he did not discuss "what they had said."

Detective Danielle Eller of the Bristol Tennessee Police Department testified that she was assigned to the Defendant's case as a child abuse investigator on November 10, 2015. She provided a timeline of her investigation as follows: the offense date was

November 2; offense reported to police on November 9; and victim interviews provided on November 12 and 17. Officer Eller attempted to contact the Defendant at his last known address on November 18; however, no one was home. She was contacted by the Defendant's family and another couple concerning the Defendant's absence. She did not speak with the Defendant until December 21, 2015. She learned through Richard Harrah that the Defendant was staying in Florida, but when she called his cell phone, he did not answer. Based on the victim's forensic interview, Detective Eller obtained a search warrant for the body of the Defendant in order to photograph the mole or birthmark described by the victim. She subsequently obtained a photograph, admitted into evidence, confirming a mole or birthmark, "on the very top upper part of [the Defendant's] left thigh right below the brief underwear, where it [is] at the leg opening."

The Defendant testified and denied committing the charged offenses. He said the victim suffered from "some emotional problems" and had a tendency to "fly off the handle." He recalled a dispute between him and the victim the week preceding the allegations. He asked the victim to clean her room and told her "you're dad's going to be getting onto you if you don't." A few days later, the Defendant learned that the victim's father had "whipped" her for not having her room clean. He believed the victim blamed him for getting her into trouble. The victim told the Defendant that she was going to "tell some things on [him]" if he did not quit making her life miserable. The next Monday, November 9, the Defendant said his family seemed very "unusual." The Defendant said that night, he went to run some errands, and when he drove back by the house, he noticed the police were there, so he "knew that [the victim] had made good on her allegations that she was going to tell some stuff on me." The police presence "terrified" him, and he explained, "We don't live in a vacuum. We all know what happens to sex offenders in this country. We don't tolerate them especially when they touch children." The same night, the Defendant left and went to Florida. When he arrived in Florida, he said he tried to get mental health treatment.

On cross-examination, the Defendant said when he saw the police, he thought the victim had made sexual allegations against him. He admitted he assumed she had since he did not know what the victim said. He said he "knew that the situation was not good" and "that [his] freedom was in danger." The Defendant explained that he lost contact with people while he was in Florida because his cell phone battery went dead, and he did not have a way to charge it. In addition, "[he] didn't feel that it would be in [his] best interest to let anybody know where [he] was[.]" When asked if he admitted the abuse to Richard Harrah, the Defendant said, "No, I never said that." He said Richard Harrah was mistaken. The Defendant also denied confessing the abuse to his mother and father. The Defendant confirmed that he had a birthmark on his thigh, but he said the birthmark was "common knowledge" to anyone who had ever seen him swim and expose his legs during the summer.

- 4 -

At the conclusion of proof and over the Defendant's objection, the trial court gave the following jury instruction regarding flight:

The flight of a person accused of a crime is a circumstance which when considered with all the facts of the case may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight, it may be open or it may be a hurried or concealed departure or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion or concealment in the community or a leaving of the community for parts unknown to constitute flight.

If flight is proved the fact of flight alone does not allow you to find that the defendant is guilty of the crime charged. However, since flight by a defendant may be caused by a consciousness of guilt you may consider the fact of flight if flight is so proven together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand an entirely innocent person may take flight and such flight may be explained by proof offered or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it and the weight to be given to it are questions for your determination.

Following deliberations, the jury returned a verdict of guilty on all counts and fixed a fine of $50,000.00 for Count 1 (rape of a child), $25,000.00 for Count 2 (aggravated sexual battery), and $15,000.00 for Count 3 (incest).

At the June 8, 2017 sentencing hearing, the trial court imposed the fines and sentenced the Defendant to forty years for Count 1, twelve years for Count 2, and six years for Count 3, to be served concurrently for a total effective sentence of forty years as a Range II, multiple offender. The trial court merged Count 2 with Count 1. The Defendant filed a motion for new trial on June 15, 2017, and an amended motion for new trial on September 6, 2017, which the trial court denied on September 11, 2017. The Defendant filed his notice of appeal on September 21, 2017.

## ANALYSIS

In his brief on appeal, the Defendant argues that the evidence presented at trial was insufficient to convict him of the offenses[2] and that the trial court erred in charging the jury on flight. In response, the State contends that the evidence was sufficient for each conviction and that the trial court properly instructed the jury. After a thorough review of the law, briefs, and record, we agree with the State.

**I. Sufficiency of the Evidence.** Rather than challenging any of the evidence establishing the elements of the offense, the Defendant attacks the victim's credibility. He asserts that the offenses were based solely on the victim's testimony, which was inconsistent with her Children's Advocacy Center interview and concocted out of revenge.

In resolving this issue, we apply the following well-established legal framework. When addressing issues regarding sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by the appellate court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, an appellate court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The Tennessee Supreme Court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)).

To convict a defendant for rape of a child, the State is required to prove the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if

---

[2] In his motion for new trial and in the issues presented in his brief, the Defendant raises three separate claims regarding sufficiency of the evidence. He asserts, "the evidence was insufficient as a matter of law to support a conviction," that "the verdict of the jury was contrary to the law and the evidence," and that "the evidence in the trial preponderates against the guilt of the defendant and in favor of his innocence." However, in the argument section of his brief, the Defendant collectively addresses the issues, citing to sufficiency of the evidence law. We will address these issues under one sufficiency of the evidence claim.

the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. §35-13-522(a). Sexual penetration means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body[.]" T.C.A. §39-13-501(7). Aggravated sexual battery, as relevant here, is "unlawful sexual contact with a victim by the defendant or the defendant by a victim" and the victim is less than thirteen years of age. T.C.A. § 39-13-504. Aggravated sexual battery is a lesser-included offense to rape of a child. State v. Howard, 504 S.W.3d 260, 274-75 (Tenn. 2016). A person commits incest who engages in sexual penetration with a person, knowing the person to be, without regard to legitimacy, the person's natural grandchild. T.C.A. § 39-15-302.

Viewing the evidence in the light most favorable to the State, the eleven-year-old victim testified that she was forced to perform fellatio on her grandfather, the Defendant. She recalled the abuse in detail, was unequivocal in her testimony, and identified a unique birthmark on the Defendant's upper thigh. On appeal, the Defendant urges this court to reverse his convictions based on the victim's credibility, an issue which is within the sole province of the jury. The jury, as was their prerogative, rejected the Defendant's denial of the offenses in favor of the victim's unwavering testimony. Moreover, the "inconsistencies" pointed to by the Defendant involve the victim's terminology of sexually explicit terms, and were in no way material to the elements of the offense. Accordingly, we conclude that any rational juror could have found the Defendant guilty of the offenses as charged in the presentment beyond a reasonable doubt. He is not entitled to relief on this issue.

**II. Jury Instruction on Flight**. The Defendant argues that the trial court's instruction on flight was inappropriate and prejudicial. He asserts that although he left the state, he did not take flight. He explains that his lack of communication was the result of mental health treatment and no phone charger.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have a duty to give "'a complete charge of the law applicable to the facts of a case.'" State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" State v. Majors, 318 S.W.3d 850, 864-65 (Tenn. 2010) (quoting State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005)); see State v. Hodges, 944 S.W.2d

346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531, 544 (Tenn. 1977)). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence exists supporting a jury instruction on flight where there is evidence of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (internal quotation, emphasis, and citation omitted). The State may satisfy the subsequent hiding out, evasion, or concealment requirement by presenting proof from which a jury might infer that the defendant committed such acts. State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999) (citing Payton, 782 S.W.2d at 498; Rogers v. State, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970)).

The evidence presented at trial established that after the Defendant saw the police at the victim's home, he assumed the victim had accused him of sexual abuse. He then drove from Tennessee to Florida, and he did not make contact with his family in Tennessee again. He left the Sanders' home abruptly, leaving his medication and belongings. Moreover, the Defendant testified to his fear of how he would be treated upon being labeled a child sex offender. These facts more than support an inference that the Defendant fled the scene to hide in Florida. The jury instruction on flight was therefore proper, and the Defendant is not entitled to relief.

## CONCLUSION

Based on the above reasoning and analysis, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE